```
0001
 1  IN THE UNITED STATES DISTRICT COURT
 2  FOR THE DISTRICT OF CONNECTICUT
 3  ------------------------------------x
 4  JOSEPH P. BICHSEL,
 5          Plaintiff,
 6     -versus-              : Civil Action No.
                              03-CV-0288 (WWE)
 7
    JILLIAN WONG AND ALEX WONG,
 8
            Defendants.
 9
    ------------------------------------x
10
11
12
13         Deposition of DR. CARMEN CINTRON, taken
14  pursuant to The Federal Rules of Civil Procedure, at the
15  law offices of Mulvey, Oliver, Gould & Crotta,
16  83 Trumbull Street, New Haven, Connecticut, before
17  Patricia Saya, LSR No. 37, a Registered Professional
18  Reporter and Notary Public in and for the State of
19  Connecticut, on August 27, 2004, at 3:30 p.m.
20
21
22
23
24
25
0002
 1  A P P E A R A N C E S:
 2       For the Plaintiff:
 3       HAMM & BARRY
         5030 Anchor Way, Gallows Bay
 4       Christiansted, Virgin Islands 00820
         By:  EDWARD L. BARRY, ESQ.
 5
         For the Defendants:
 6
         MULVEY, OLIVER, GOULD & CROTTA
 7       83 Trumbull Street
         New Haven, Connecticut 06511
 8       By:  ROBERT G. OLIVER, ESQ.
 9
10
11
12
```

```
0003
 1                STIPULATIONS
 2
 3          IT IS HEREBY STIPULATED AND AGREED by and
 4  between counsel for the respective parties hereto that
 5  all technicalities as to proof of the official character
 6  before whom the deposition is to be taken are waived.
 7
 8          IT IS FURTHER STIPULATED AND AGREED by
 9  and between counsel for the respective parties hereto
10  that the signing of the deposition by the deponent may
11  be performed before any Notary Public.
12
13          IT IS FURTHER STIPULATED AND AGREED by
14  and between counsel for the respective parties hereto
15  that all objections, except as to form, are reserved to
16  the time of trial.
17
18
19              * * * * * *
20
21
22
23
24
25
0004
 1                I N D E X
 2  WITNESS           DIRECT  CROSS  REDIRECT  RECROSS
 3  CARMEN CINTRON      5      60      62        --
 4
 5
 6
 7            DEFENDANTS' EXHIBITS
 8  NO.     DESCRIPTION                   PAGE
 9
    1   Curriculum vitae                   7
10
    2   DA Certificate and copies of St. Croix,
11      Virginia, and North Carolina licenses   35
12
13
14  (Exhibits were retained by counsel.)
15
16
17
18
19
```

```
20
21
22
23
24
25
0005
 1              MR. OLIVER:  Mr. Barry, stipulations;
 2  proof of official character, et cetera?
 3              MR. BARRY:  I don't know.  I still don't
 4  know what the customs and practice is.
 5              MR. OLIVER:  Proof of official character?
 6              MR. BARRY:  Yes, of course.
 7              MR. OLIVER:  Proof of notice?
 8              MR. BARRY:  Of course.
 9              MR. OLIVER:  And all objections except as
10  to form reserved to the time of trial?
11              MR. BARRY:  Yes.
12              MR. OLIVER:  Is there anything I missed?
13              (Off the record discussion.)
14  C A R M E N   C I N T R O N,
15  of Suite 5 Sundial Park, Gallows Bay, St. Croix 00824,
16  called as a witness, having been first duly sworn by
17  Patricia Saya, a Notary Public in and for the State of
18  Connecticut, was examined and testified as follows:
19  DIRECT EXAMINATION
20  BY MR. OLIVER:
21      Q.   Doctor, first of all, I want to thank you for
22  coming.  As I understand it, you have been up somewhere
23  in Massachusetts on personal matters?  Is that it, and
24  you have driven down here today; is that correct?
25      A.   That is exactly correct.
0006
 1      Q.   Do you have with you -- I notice you have some
 2  papers.  Do you have your chart or records with respect
 3  to Joseph Bichsel?
 4      A.   Yes, I do.  Let me just put it in beginning to
 5  end.
 6      Q.   Why don't you do that?  Let me get started
 7  just by a couple quick ground rules.  Wait until I
 8  finish asking, or likewise, Mr. Barry, before you
 9  answer, so that the Reporter can accurately transcribe
10  each person.  If you don't understand a question I have
11  asked, please tell me so.  Fair enough?  And any answer
12  you do has to be verbal so she can record it.
13      A.   Okay.  Very good.
14      Q.   Have you brought with you then today your
15  chart or file on Joseph Bichsel?
```

16    A.  Yes, sir.
17    Q.  Let me ask you this. Do you have with you a
18  CV of yourself?
19    A.  Yes, I do.
20    Q.  Could you show that to us, please?
21    A.  Yes, this is most accurate.
22    Q.  Is that reasonably accurate as of the present
23  time? If you could show it to Mr. Barry, and then pass
24  it to me. I would like to have this -- can you spare
25  this?
0007
1    A.  Yes, sure.
2        MR. OLIVER: I would like to have this
3  marked as -- Exhibit 1 I guess is fine.
4        (Defendants' Exhibit 1: Marked for
5  Identification - described in Index.)
6    Q.  And could you tell me -- I know it is
7  summarized briefly, but what is your present
8  professional status?
9    A.  I am an internal medicine doctor, residency
10  trained. I graduated from an osteopathic medical
11  school, New York, New York College of Osteopathic
12  Medicine, so I practice two things. My specialty is
13  internal medicine, and I also practice osteopathy. The
14  osteopathy I would say comprises about 40 to 45 percent
15  of my practice, with internal medicine in the remainder.
16    Q.  Where do you practice?
17    A.  On St. Croix.
18    Q.  In the Virgin Islands?
19    A.  Yes, sir.
20    Q.  Are you licensed to so practice in the Virgin
21  Islands?
22    A.  Yes, sir.
23    Q.  Is that a license purely for osteopathic
24  medicine or does that include a license for internal
25  medicine?
0008
1    A.  That is a license for medicine and surgery,
2  but they know that I am an internist, that I have all
3  those credentials, and so yes, it is a license that
4  permits me to practice internal medicine as well as
5  osteopathy.
6    Q.  If you could just pass that sheet to Mr.
7  Barry, and he can take a look at it. And I think maybe
8  it would probably -- what do these consist of, these
9  documents?
10    A.  The first, the green document, is the original
11  DA certificate, which shows my DA number, and date of

12  expiration. The other three are just wallet-size copies
13  of my license in St. Croix, Virginia, and North
14  Carolina, and all of them are currently.
15        MR. OLIVER: Rather than waste time, I
16  would ask that a copy be marked as Exhibit 2, and I will
17  have someone come make a copy for us. Is that
18  satisfactory, to you, Mr. Barry?
19        MR. BARRY: Sure.
20     Q. And following your graduation -- it says on
21  your CV in 1989, from the New York College of
22  Osteopathic Medicine -- what was your education or
23  training in that professional field?
24     A. I went -- in osteopathy?
25     Q. Well, in any professional field then. You
0009
1  tell me.
2     A. I went on to Eastern Virginia Medical School,
3  UVMS. That was in Norfolk, Virginia, and I did three
4  years of internal medicine.
5     Q. And thereafter, what, if any, education or
6  training did you have?
7     A. That was it.
8     Q. When did you commence -- after you finished in
9  Norfolk, where did you go?
10    A. Initially I went back to St. Croix for a very
11  short period. Then I returned to the mainland. I think
12  it was about 1993, to Winston-Salem, North Carolina.
13    Q. What were you engaged in at that place?
14    A. More internal medicine. I started an urgent
15  care facility, and then I went and worked with Forsythe
16  Medical Hospital. That was pure internal medicine.
17  They sent us out to a country hospital. I guess it was
18  a physician shortage area, and we established a group
19  practice up there. And at that time I was doing
20  75 percent internal medicine and about 25 percent
21  osteopathy.
22    Q. What was that time frame that you were in
23  North Carolina?
24    A. About six years.
25    Q. And what licenses, if any, did you have in
0010
1  North Carolina at that time?
2     A. At that time, I had a St. Croix license that
3  had expired, and I had an active Virginia license as
4  well as an active North Carolina license.
5     Q. Following that approximately six-year period,
6  how were you professionally engaged, after that six-year
7  period?

8   A.   After, I went back to St. Croix, and I worked
9   as an internal medicine attending, and I started a
10  practice. It was a young practice. I did that for
11  about two years, did some emergency room medicine on the
12  side for moonlighting purposes. And then finally, I
13  came to open this Gallows Bay office about two and a
14  half, almost three years ago.
15      Q.   So approximately what year would that be,
16  2001, 2002?
17      A.   Yes. 2002, I think.
18      Q.   And is this your practice alone or are you
19  associated with other professions?
20      A.   Solo. When I return home, I am going to be
21  associated with a Dr. Walter Gardner, but I am not
22  associated with him yet. But that is in my immediate
23  plan when I get back home.
24      Q.   What is the nature of his profession?
25      A.   He is an internal medicine doctor,
0011
1   nephrologist. He does dialysis, mostly.
2       Q.   And is he an M.D.?
3       A.   Yes.
4       Q.   But you have not yet commenced with him?
5       A.   We have signed contracts.
6       Q.   The office hasn't begun yet?
7       A.   No, no. Right, right.
8       Q.   With respect to the current practice that you
9   have had in the year 2004, prior to your engaging with
10  Dr. Gardner, could you tell us what that practice has
11  consisted of?
12      A.   As far as patients' ailments or how big it is
13  or how much equipment I have in there or --
14      Q.   Sure, that is a fair question. Let me
15  rephrase it. Specifically, how have you focused your
16  professional work, on what aspects of medicine?
17      A.   To suit the needs of my patients, whoever --
18  that office is a very versatile office because I am a
19  very versatile physician, so I go anywhere from somebody
20  who needs a follow-up for a high blood pressure check to
21  somebody who needs to be sutured to somebody who needs
22  to have a pelvic exam to somebody who is coming in with
23  chronic pain to somebody who needs sinus -- it is a very
24  diverse practice. I meet the needs of my patients. If
25  their needs are beyond what I can offer, I refer them.
0012
1       Q.   Your stationary that we do have says "Internal
2   Medicine." Then the next line says "Osteopathic
3   Medicine;" is that correct?

```
 4     A.  Yes.
 5     Q.  Could you tell us what you mean, what the
 6  scope of your practice in internal medicine is, when you
 7  described yourself as practicing in internal medicine?
 8     A.  As far as interpretation of -- I don't
 9  quite -- internal medicine --
10         MR. BARRY: You are asking her to define
11  the field.
12     Q.  I will withdraw the question. Tell us, in
13  your practice -- what is involved with your internal
14  medicine practice?
15     A.  Everything that a person who has an internal
16  medicine problem needs. For instance, I can manage
17  diabetes. I can manage coronary artery disease. I can
18  manage hypolipidemia. I can manage COPD, chronic
19  obstructive pulmonary disease. I can manage asthma.
20         I am limited in my management of dermatology,
21  but I can manage some basic dermatological problems. I
22  do acute things; like sore throat, earache, urinary
23  tract infections, those kinds of things. I can manage
24  dehydration. I can do -- I can interpret my own EKG. I
25  can read my own chest x-rays. I can read my own scalp
0013
 1  films. I can do pretty much very broad internal
 2  medicine work.
 3     Q.  Now, with respect to the aspects of
 4  osteopathic medicine, what is the scope of the work that
 5  you do in your professional work in the current office
 6  at Gallows Bay?
 7     A.  I review x-rays that the patients may have,
 8  the actual x-ray, or an x-ray report. If they don't, I
 9  get my hands on it. I document physical complaints,
10  symptomatic complaints, duration of illness, limitation
11  of range of motion, impact on quality of life, and then
12  I do manipulation therapy.
13     Q.  I'm sorry, you do what?
14     A.  Manipulation therapy. That is OMT,
15  abbreviated osteopathic manipulation therapy, where I
16  treat chronic musculoskeletal pain. I cannot fix a
17  scoliosis with my hands. A lot of the chronic cervical
18  and lumbar pain, I can offer some sort of temporary
19  relief of pain, but I cannot fix a herniated disk. I
20  cannot make a weak leg stronger: I am limited to my
21  hands. I can't go deeper than my hands can feel.
22     Q.  Can you give me a percentage breakdown, as you
23  did in Virginia -- I'm sorry, as you did in North
24  Carolina, with respect to the practice you have had at
25  Gallows Bay from 2002 to the present time as between
```

```
0014
 1  internal medicine and osteopathic medicine?
 2      A.  Osteopathy -- as I said earlier, I believe I
 3  said about 45 percent, between 40 and 45 percent of my
 4  patients -- and that is a growing number -- become
 5  osteopathic-type patients because a lot of my chronic
 6  patients, like my diabetics and my hypertensives and my
 7  older people with arthritis and tendonitis and all this,
 8  have now recognized that I can help them too.  So that
 9  number is actually growing.
10      Q.  Have you been certified by any board --
11      A.  No, sir.
12      Q.  You have to let me finish the question.
13      A.  Okay.
14      Q.  -- within the osteopathic medicine field?
15      A.  No.
16      Q.  Have you published any learned articles in the
17  osteopathic medicine field?
18      A.  No.  I'm sorry.  No, sir.  I'm sorry.
19      Q.  It has to be verbal.
20      A.  Yes, yes, yes.  Okay.
21      Q.  Are you active in any professional
22  organizations with respect to the osteopathic medicine
23  field?
24      A.  No, sir.
25      Q.  Now, when did you first see Joseph Bichsel as
0015
 1  a patient?
 2      A.  On 3/24 -- I'm sorry, 3/2/04.
 3      Q.  And you can feel free to refer to your
 4  records, and I think it if I could briefly just see a
 5  copy to compare with what I have to make sure I have the
 6  same thing.
 7      A.  Of my office records?
 8      Q.  Yes, ma'am, relating to this particular
 9  patient.
10      A.  Yes.
11              MR. OLIVER:  You can take a look at it,
12  Mr. Barry.
13              THE WITNESS:  This is the summary.
14      Q.  Why don't you pass that through?  We can just
15  make sure what it is, and then we know what we have.
16  Feel free to refer to those if you wish.  And how did he
17  come to see you as a patient?
18      A.  As a referral by Attorney Barry.
19      Q.  And what information, if any, did Mr. Barry
20  provide you relative to this referral?
21      A.  Well, he talked to me about him several
```

```
22  months, about two or three months, before Mr. Bichsel
23  actually came to the office. And he said, you know,
24  "Carmen, I have been thinking about referring you a
25  patient. He is having a lot of back pain. He was in a
0016
 1  car accident, and just take a look at him and see if you
 2  can help him out."
 3      Q.  Did he indicate to you one way or the other
 4  whether that was a case that was in suit or litigation
 5  or claims pending?
 6      A.  No.
 7      Q.  Had Mr. Barry ever referred any patients to
 8  you before that time?
 9      A.  Not really. There was one other lady. I
10  forget her name. We were on a trip. I met her before,
11  so she knew of me. So that was like a direct referral.
12      Q.  What about Mr. Barry's firm itself, Hamm &
13  Barry? Has that firm referred other patients other than
14  Mr. Bichsel to your practice?
15      A.  No, sir.
16      Q.  Have you ever treated Mr. Barry or members of
17  his family?
18      A.  I saw Ed about once or twice.
19      Q.  As a patient?
20      A.  As a patient.
21      Q.  Since you have seen Mr. Bichsel, has there
22  been any further references by Mr. Barry or his firm of
23  a patient to you?
24      A.  I sent one of my patients to him. That was I
25  guess a cross-reference from the other direction.
0017
 1      Q.  And that was a patient you said you sent to
 2  Mr. Barry, presumably, for some legal purpose; is that
 3  it?
 4      A.  Yes, sir, that's correct.
 5      Q.  So since you first saw Mr. Bichsel, Mr. Barry
 6  and his firm have not referred any other patients to
 7  you? Is that what you are saying?
 8      A.  Yes.
 9      Q.  Just remember, answer verbally.
10      A.  Yes.
11      Q.  What records, if any, were provided to you
12  before or obtained by you before you saw Mr. Bichsel?
13      A.  None.
14      Q.  Were you provided any reports or records of
15  his prior treatment at any time?
16      A.  Yes, sir.
17      Q.  When did that happen?
```

```
18      A.  Subsequent to the visit.  I called Ed, and I
19   said, "Yes, Ed, this guy has got some problems.  Do you
20   have any x-ray reports, any" -- and then they came.
21      Q.  Do you have with you today what was provided
22   to you?
23      A.  Yes, sir, I do.
24      Q.  They are in package of some sort, so we can
25   just quickly look and see what they are?
0018
 1      A.  Sure, yes, yes.  I kind of organized them to
 2   my -- I guess you can send these down.  Let me just put
 3   a paper clip in this.
 4      Q.  You have handed Mr. Barry and myself a package
 5   of reports.  Are these the sum total of all the reports
 6   that was provided to you?
 7      A.  There is more.  This is the second little
 8   bunch.
 9      Q.  Do we now have all of them?
10      A.  Yes, sir.
11              MR. OLIVER:  I am not going to clutter
12   the record, Mr. Barry, with documents, but simply read
13   into the record what they are.
14              MR. BARRY:  Sure.
15              MR. OLIVER:  Appear to be the reports of
16   Dr. Hugo B. Cesar, August 29th, 2002 -- actually, begins
17   July 1, 2002, and appears to go to May 16, 2002.  That
18   is backwards, isn't it?  The last date being August
19   29th, 2002; Dr. Richard A. Bronen, M.D.'s CV.  And that
20   is all it is, correspondence from my office to you,
21   which is related to this, trying to set up the
22   deposition, so we will put that back.
23              THE WITNESS:  There is something else by
24   Dr. Bronen.  It is more than his CV,
25              MR. BARRY:  He has got it.
0019
 1              THE WITNESS:  I just took that out.
 2              MR. OLIVER:  Leave that out.  If I
 3   haven't read it off, tell me.  One page of Chinese
 4   Acupuncture Health Care, a report of April 16th, 2003 by
 5   Dr. MacKenzie, May 5, 2003 report of Dr. Bartolomei, a
 6   notice of your deposition.  Of course, that is not part
 7   of the medical records, but that is all right.  Records
 8   of Dr. Frank T. Bishop between June 12th, 1991 and May
 9   23rd, 2003, a copy of the deposition of Dr. Bartolomei
10   taken August 3rd -- August 3rd, 2004, with his exhibits
11   attached, a letter of Dr. Bronen, Richard A. Bronen, of
12   March 20th, 2003; Imaging Center, Diagnostic Radiology
13   report of July 11, 2001; MRI reports, total of four
```