0038
1   that was hurting him the most was his left shoulder, his
2   mid to low back, and parts of his low back area. So he
3   had tried to work.
4       Q.   Do you know whether he had done any work
5   between June, 2001 and three weeks prior to March 2nd,
6   2004?
7       A.   Before the accident?
8       Q.   The accident was in June of 2001. And you
9   first saw him, if I am correct, March the 2nd, 2004?
10      A.   Yes.
11      Q.   And you just indicate that he told you that
12  three weeks before March the 2nd, 2004, he had started
13  working; is that right?
14      A.   Yes, sir, tried to work.
15      Q.   "Then started working three weeks ago" is what
16  your note said; is that correct?
17      A.   Yes.
18      Q.   What, if any, work had he done, if you know,
19  between June, 2001 and three weeks prior to March of
20  2004?
21      A.   I don't know.
22      Q.   Thank you. Do you know whether he had
23  sustained any injury in any accidents between June, 2001
24  and the time you saw him in 2004?
25      A.   Yes. He was robbed at his home, and I believe
0039
1   it was two or three men. It was more than one guy, to
2   his recollection, and he was beaten. No bones were
3   broken. I don't believe he went to the hospital for any
4   x-ray studies, if my memory serves me correct.
5       Q.   Do you know when that occurred?
6       A.   No.
7       Q.   And did he indicate to you whether any
8   particular part of his body was injured in that assault
9   or beating?
10      A.   His entire back, more pain, similar to what
11  had happened before, just more exacerbation.
12      Q.   Do you have any further information on that
13  assault incident other than what you have just told us,
14  based upon a recollection of what he said?
15      A.   No, sir.
16      Q.   I didn't see a reference to that in your
17  notes?
18      A.   I know, yes, yes. That is my negligence
19  because it should have been in there, because we did
20  talk about it.
21      Q.   Your last visit he had with you was on May 7,

22  2004; is that correct?

23      A.  That's correct.

24      Q.  The most recent one; am I correct?

25      A.  Yes.

0040

1       Q.  And the complaints indicate, "felt better

2   until yesterday at T11." Is that part of the thoracic

3   spine?

4       A.  Yes, sir.

5       Q.  "The low back is good, and the left shoulder

6   has really improved;" am I correct?

7       A.  Yes, sir.

8               MR. BARRY:  Where are we at right now,

9   April 30th?

10              MR. OLIVER:  May 7th, '04, sir.

11              MR. BARRY:  Did we skip April 30th?

12              MR. OLIVER:  We went to the most recent

13  one.  I don't think I asked a specific question on it.

14  Do you have it?

15              MR. BARRY:  Go ahead, please.

16              MR. OLIVER:  Could my last question be

17  read back?

18              (Question read.)

19      Q.  I see no reference there to the neck.  Did he

20  have any complaints about the neck on the last visit?

21      A.  On 5/7 --

22      Q.  Yes, ma'am.

23      A.  -- his neck was actually doing pretty good

24  that day.  C spine was nicely aligned in my physical

25  exam.

0041

1       Q.  And then on your Assessment & Plan, you

2   indicated that the lumbosacral strain had resolved for

3   now, if I am correct?

4       A.  That's correct.

5       Q.  "OMT" -- what is the word that follows that?

6       A.  "Done."

7       Q.  In other words, your therapy that had been

8   concluded?  Is that what that means?

9       A.  No.  I worked on him just a little bit more,

10  not as intense.  He was going to go to Oregon, and I

11  said, "You know what?  You are not feeling really nice

12  and good for the airplane trip."  I think he was leaving

13  the next day.

14      Q.  What does the word "done" mean?

15      A.  Performed.

16      Q.  Then the cervical strain, it says, "With left

17  radiculopathy, good response to therapy, and OMT was

18   done."
19        A.   Performed, yes.
20        Q.   And then "herniated disk T11-T12 with" -- why
21   don't you read the rest of it?
22        A.   "Trigger point tenderness.  Unable to resolve
23   with counterstrain" -- that should be "which was done
24   today," done today, performed today.
25        Q.   So if I read it correctly then, the only
0042
1    complaint relative to that that wasn't essentially
2    resolved when you last saw him related to the thoracic
3    spine; is that correct?
4         A.   That would be correct, yes, sir.
5         Q.   Then what does it say down here, the last
6    three lines of your note, Doctor?
7         A.   "Patient to relocate to Oregon, recommend find
8    DO or chiropractor as needed for any reoccurrence of
9    pain."
10        Q.   And a DO would be an osteopathic physician,
11   such as yourself; is that correct?
12        A.   Yes, sir.
13        Q.   Did you give him any references in Oregon for
14   that purpose?
15        A.   No, sir.
16        Q.   Now, how did you locate the doctor that you
17   did talk to on the telephone that you told us about at
18   the start of the deposition?
19        A.   JP had contacted Ed, and Ed contacted me.
20        Q.   And gave you the name of the particular
21   doctor?
22        A.   Yes.  Yes, sir.
23        Q.   So that was a doctor whose name had been
24   supplied to you by Mr. Barry, and you had not actually
25   sought him out?  The name was given to you; am I
0043
1    correct?
2         A.   Correct.
3         Q.   Now, there is another portion of your file,
4    which is this typed report, which I believe you signed
5    and dated June 2nd, 2004; am I correct?
6         A.   Yes.
7         Q.   Looking at this type, just make sure we have
8    the same document; is that correct?
9         A.   Yes.  My date is cut off, so I wasn't sure if
10   it was the 2nd or the 7th, but yes.  Yours is clear.
11   Yes, it is the 2nd.
12        Q.   It is the 2nd?
13        A.   Yes, sir.

14    Q.   Okay, no problem.  What was the purpose of
15 preparing this document?
16    A.   To summarize whether or not -- based on my
17 examination of Mr. Bichsel, whether or not I thought
18 that the injuries sustained to his musculoskeletal
19 system were related in any way or directly resulted from
20 the car accident in 2001.
21    Q.   Did you prepare this at the request of Mr.
22 Barry?
23    A.   Yes, sir.
24    Q.   Now, the first paragraph, except for the last
25 sentence, appears to be a summary of the history; is
0044
1  that correct?
2     A.   Recap, exactly, sir.
3     Q.   Then you go on to say, "Radiographic workup
4  documented the following musculoskeletal injuries which
5  are a direct result of the collision in 2001."  You list
6  a number of items?
7     A.   Yes, sir.
8     Q.   And as I understand it, you had not -- when
9  you prepared this, you hadn't looked at any films; am I
10 correct?
11    A.   That's correct.
12    Q.   Can you tell me what radiographic reports or
13 written reports of radiographic workups refer to each of
14 these items?  Specifically, the first one, the erector
15 spinae spasm, what report documented that?
16    A.   One of them said "Flattening of the L spine."
17 I will find it if you just bear were me.  I should have
18 marked it, if I had realized that is where we were going
19 to go.  Spasm is also something I can feel with my
20 fingers.
21    Q.   Did you feel any spasm on his spinal column at
22 any time you saw him?
23    A.   Yes, on the note dated 3/10/04, "Bilateral
24 lumbar spasm with right ASS, trochanteric, and
25 piriformis trigger point tenderness."
0045
1        Hang on though.  There is a film in here that
2  reverses the curve, and that is consistent with lumbar
3  spasm, and I will find it, unless you would like to ask
4  me another question.
5     Q.   Well, let me ask you this, ma'am.  Maybe the
6  best way to say it is, these items -- I count 12
7  separate items there listed -- did you derive each and
8  every one of these from reviewing written reports that
9  you have been provided?

10   A.  Yes, sir, each and every one.
11   Q.  And so that you don't have any independent
12  information with respect to what those particular films
13  showed other than whatever of the report was that was
14  provided to you, I guess through the offices of Mr.
15  Barry?
16   A.  Let me make sure I understand your question.
17   Q.  Want me to ask it again?
18   A.  Yes.
19   Q.  Sure.  Other than the report or reports that
20  were provided to you through Mr. Barry's offices --
21   A.  That is all I have.
22   Q.  -- that is all you have?
23   A.  Yes, sir.
24   Q.  And as I understand it, Mr. Bichsel told you
25  about the accident in June of 2001; is that correct?
0046
1   A.  Yes, sir.
2   Q.  And you know about the assault that occurred
3  at some later date?
4   A.  Yes, sir.
5   Q.  And do you have any information with respect
6  to any other accidents that befell or injuries sustained
7  by Mr. Bichsel between June, 2001 and the time you saw
8  him in 2004, other than the assault?
9   A.  No, sir.
10   Q.  The next full paragraph, beginning, "All of
11  the above," do you see that, ma'am?
12   A.  Yes, sir.
13   Q.  That refers to this question I asked you a few
14  minutes ago about attempting to return to work.  Do you
15  know specifically that work he attempted to return to in
16  February of 2004 was?
17   A.  No, I don't.  Specifically, I can only assume
18  that it was the work he usually did, which was
19  construction or construction-related.
20   Q.  And do you know whether or not he worked at
21  all in the year 2003?
22   A.  No, sir, I don't.
23   Q.  The same question with respect to 2002?
24   A.  No, sir, I don't.
25   Q.  And the last six months of 2001, after the
0047
1  accident?
2   A.  No, sir, I don't.
3   Q.  Where it starts off again, "After 3 weeks left
4  shoulder pain, weakness reoccurred," and so forth, it
5  talks about pains and walking and starting and so forth,

6  going to the sentence ending, "at times forcing bed
7  rest" -- do you see where I have referred to?
8           MR. BARRY: Well --
9      Q.  Never mind. I will withdraw that. There is a
10 sentence that says, "After 3 weeks" -- do you see that,
11 ma'am?
12     A.  "After 3 weeks left shoulder pain and
13 weakness."
14     Q.  Yes, ma'am.
15     A.  Yes.
16     Q.  Then the next sentence, "He is unable to
17 comfortably lift," and so forth?
18     A.  Yes.
19     Q.  The next sentence, "Prolonged walking and
20 standing," and so forth?
21     A.  Yes.
22     Q.  Is that based upon what he told you?
23     A.  That is based upon what he told me, yes.
24     Q.  At the last sentence you said, "To more
25 accurately assess the degree of injury I have
0048
1  recommended myelogram studies of cervical spine,
2  thoracic spine, and lumbar spine with neurosurgical
3  evaluation"?
4      A.  Yes, sir.
5      Q.  And do you know whether those have ever been
6  performed?
7      A.  That is what I was saying. That piece of my
8  note is missing because it is probably in the mail.
9      Q.  And the doctor you spoke with in Oregon, did
10 you tell him you were recommending those three types of
11 myelographic studies?
12     A.  Yes, sir.
13     Q.  Did the doctor indicate to you, to the best of
14 your recollection, that he agreed and would perform
15 those, or did he not?
16     A.  Well, he just said, "Let's go on ahead and
17 schedule the appointment, and I will let you know my
18 findings and recommendations."
19     Q.  You said in your last paragraph, in your
20 clinical judgment, he will likely require surgical
21 intervention in the future. What is that opinion based
22 on?
23     A.  That opinion is based on the two lesions in
24 his lumbar spine, L4-L5 and L5-S1. Apparently, the
25 stress of the trauma tore the disk annulus. That is
0049
1  like the inner lining of the intervertebral disk. That

2  is a pre-rupture finding. So if this gentleman
3  continues to do the kind of work that he does and uses
4  his body to perform those lifting, climbing, whatever --
5  his job, and jumping from place to place, whatever
6  construction workers do, I suspect that he will rupture
7  those disks.
8      Q.  A tear of disk annulus L4-L5/L5-S1, is that
9  also consistent with degenerative changes that occur in
10  the construction worker?
11      A.  No, not to my knowledge.
12      Q.  My question -- I meant in the absence of
13  trauma, apart from the day to day work of a construction
14  labor?
15      A.  The force that it would require to tear the
16  outer lining of your disk, you could probably -- if you
17  jumped off of that roof and landed on your back, you
18  could tear. You could even herniate. It takes a fair
19  amount of direct force, some kind of direct force. It
20  is more than just wear and tear.
21          Now, if you are saying that he fell off the
22  ladder while doing construction work, yes, that could
23  happen, depending on how high up it was. But when we
24  talk about degenerative changes, like an arthritic
25  spine, we don't just degenerate and tear our -- the disk
0050
1  dries out. We don't like tear stuff around it. It is
2  just degenerative.
3      Q.  Are you aware that there are medical reports
4  that were among those supplied to you by various doctors
5  supplied to you by Attorney Barry that contain
6  references concerning the possibility of surgery? Let
7  me withdraw that.
8      A.  I'm sorry. Did any other doctor recommend
9  surgery?
10      Q.  No. Let me ask the question again. Amongst
11  records that Mr. Barry supplied you, you have the record
12  of Dr. Bishop; is that correct?
13      A.  Yes, I do.
14      Q.  Are you aware that Dr. Bishop indicates no
15  surgery is indicated?
16      A.  No, I am not, not off the top of my head.
17      Q.  Are you aware that Dr. Levine indicates no
18  surgery is indicated?
19      A.  They didn't have a myelogram. How could they
20  come to that conclusion?
21      Q.  My question is not what it was. Are you aware
22  that Dr. Levine indicated no surgery was indicated?
23  That was my question.

24    A.  If it is in there, I read it, at one point I
25  became aware of it.  Right now I don't remember for sure
0051
1  if that is what they said.
2    Q.  Fair enough.  And the same question I am going
3  to ask you, Dr. MacKenzie, are you aware that his report
4  of April 16th, 2003 indicated no surgery was
5  recommended?
6    A.  Same answer.
7    Q.  And Dr. Bartolomei, of May 5, 2003, and his
8  deposition, which you have indicated no surgery was --
9    A.  Same answer.
10    Q.  I believe Dr. Margolis' report, that indicated
11  no surgery was indicated?
12    A.  Yes.  It would be the same answer.
13    Q.  Okay, fair enough.  Do you have any other
14  opinions relative to Mr. Bichsel's physical condition
15  that you haven't told us about today?
16    A.  I have opinions of his overall health.  This
17  is a very, very healthy man, doesn't smoke, doesn't
18  drink, doesn't have any kids, doesn't have a wife.  I
19  mean, he eats well.  He takes care of himself.  I mean,
20  this is the kind of person who could live to be a
21  hundred.  He has got good health.  And I think if it
22  weren't for that car accident, he would be a much more
23  productive person and a much happier person.  I think
24  that really -- that set him back, and I don't think he
25  has come to the realization that this is his new body.
0052
1    Q.  You mentioned in your first note, when you
2  first saw him at the start of March, 2004, a reference
3  to depression.  Did he give -- has he exhibited any
4  further symptoms on the occasion of the other visits?
5    A.  Symptoms of depression are so subtle.  Did he
6  come into the office crying?  No.  Did he come into the
7  office sort of at times with his head hanging low and
8  walking a little -- no smile?  Yes.  Did he come into
9  the office saying, you know, "I couldn't sleep at all
10  last night and" -- yes.  Did he come
11  into the office expressing concern about his future and
12  how much benefit can he get from what I am trying to do
13  to help him?  Yes.
14        Depression is a subtle thing.  I mean, did he
15  say he wanted to commit suicide?  No.
16    Q.  I did not see other reference to the word
17  "depression," am I correct, other than the first visit?
18    A.  That's correct.
19    Q.  Ma'am, did you charge him for your services?

20    A.  Yes, sir, I did.
21    Q.  And I do not have a copy of the bill or bills.
22    A.  You know, unfortunately, that is all on St.
23  Croix too.
24    Q.  Could you tell us what your rate would have
25  been for the first visit and then for subsequent visits?
0053
1    A.  My first visit, $90 with everything; history,
2  physical, and the beginning of treatment.
3    Q.  What about subsequent visits, ma'am?
4    A.  That is $60 a visit.
5    Q.  And would that have been true of each of the
6  subsequent visits?
7    A.  Yes, sir.
8    Q.  So as a matter of mathematics, we can simply
9  multiply by the number of visits?
10    A.  Exactly.
11    Q.  Has any portion of that been paid?
12    A.  He paid cash or check.  Sometimes he wrote a
13  personal check.
14    Q.  So am I correct then that the entire amount of
15  these bills has been paid?
16    A.  Yes, sir.
17    Q.  Since May the 7th, 2004, the last visit for
18  which you have office notes, have you had any personal
19  contact with him?
20    A.  No, sir.
21        MR. OLIVER:  That is all I have.  Thank
22  you very much, ma'am.
23        MR. BARRY:  I have nothing.
24        (Off the record discussion.)
25  BY MR. OLIVER:
0054
1    Q.  As I understand it, Doctor, you wish to add
2  something to your testimony?  Is that it?
3    A.  Yes, sir.
4        MR. OLIVER:  All right.  Is that
5  satisfactory with you, Mr. Barry?
6        MR. BARRY:  Of course.
7    A.  This is in an effort to better delineate why I
8  can say with confidence that all the injuries were
9  caused from the trauma.  Prior to the accident, he was
10  in excellent health.  He had no physical complaints of
11  pain or anything like that until after this accident
12  occurred.
13        Unfortunately, the MRIs are dated a year, some
14  of them two years, after the initial accident, which
15  makes it very hard to say what is truly acute from what

16  is chronic, because if you had an accident in 2001 and
17  they did an MRI on you nine months later, it would be a
18  chronic finding from an incident that had occurred
19  previously.
20          And in particular, I want to address where
21  they talk about Grade 1 spondylolisthesis. That is
22  usually a condition that people are born with. However,
23  if you believe that all of this herniated disk
24  throughout this gentleman's spine is a result of the
25  blunt trauma of the car accident, then I could safely
0055
1   say that that Grade 1 spondylolisthesis was also a
2   result of the car accident because I believe that he
3   tore the disk annulus during that accident as well. And
4   if this man the was born with a Grade 1
5   spondylolisthesis, if that force tore the disk annulus
6   of the two vertebrae, one above and one below, it should
7   have actually made his Grade 1 spondylolisthesis worse.
8   So they should have found, in my mind, a Grade 2 or even
9   a Grade 3 if he had indeed -- if he was born with that,
10  because his spine sustained the blunt trauma of this
11  impact, and I believe -- I truly believe that all of
12  these herniated disks and his cervical disks, his
13  thoracic spine, and his lumbar spine, as well as the
14  tear in the rotator cuff muscle, is a result of this car
15  accident, because he could not work with a left shoulder
16  that was hurting if that had been a chronic problem, and
17  he would have sought medical attention if his back had
18  been hurting previously, just given the nature of his
19  work. He could not work if these things were all like
20  that.
21          So that is all I would like to close by
22  saying. And in the flat spine of the x-rays -- and I
23  wish to God I had marked it off -- they talk about
24  flattening of the lumbar spine, and that is consistent
25  with lumbar muscle spasm. And I know I read it in here,
0056
1   so the initial question that you asked me about spasm,
2   and that is it.
3       Q.  Let me just -- if I can ask you a question. I
4   just want to be clear. Do you have an opinion with
5   reasonable osteopathic probability or certainty as to
6   whether or not the Grade 1 spondylolisthesis, which has
7   been diagnosed by several doctors, is or is not related
8   to this motor vehicle accident?
9       A.  I just said I think it is a direct result. I
10  think it is a direct result. I think if he was born
11  like that, it would have been -- it would have been

12  worse.  It would have progressed to a Grade 2 or Grade
13  3.  If you are operating under the presumption -- which
14  I am -- that all of his other injuries occurred as a
15  result of that accident, then yes.  And I am operating
16  under that presumption because he didn't have these
17  problems prior to the accident.
18          Now, did the assault make them worse?
19  Possibly, possibly, but it is hard for me to say how
20  much worse that assault was because I have no idea of
21  exactly what happened, how hard he was flung, if at all,
22  if people landed on him.  You know what I mean?  But
23  with the car, I know he is strapped in his seat.
24          People in New York drive about 75, 85 miles an
25  hour.  They are going to the airport, and I can only
0057
1   imagine this guy was slammed.  And so his restrained
2   body had to take that blunt force trauma from behind, so
3   it pushed all of those vertebral bodies and knocked
4   things out asunder and herniated this and popped this
5   out.  If he didn't wear his seat belt, he probably could
6   have been dead.  He would have gone right through the
7   windshield.
8       Q.  So is your opinion based on an assumption that
9   the relative difference in speed between the two
10  vehicles was 75 to 80 miles an hour?
11      A.  That is my assumption.  That is my assumption.
12  I have no idea how fast the guy behind him was going.
13      Q.  And if the relative differential speed of
14  impact was less than 75 to 80 miles per hour, would that
15  affect your opinion?
16      A.  No, because it is going to be twice that
17  whatever impact hits.
18      Q.  I'm sorry, I misunderstood.
19      A.  Unless it was a tap at a stoplight -- say, for
20  instance, you tap somebody.  I would say yes, these
21  injuries were not caused by -- that is a tap.
22      Q.  Let me just ask the question so it is clear.
23  What I was referring to was a differential speed; that
24  is, the difference between the speed of the vehicle in
25  which Mr. --
0058
1              MR. BARRY:  I think she answered your
2   question.
3              MR. OLIVER:  We will correct it and make
4   sure it is correct.  I don't want there to be any
5   misunderstanding, Mr. Barry.
6       Q.  My question was, the differential speed; that
7   is to say, the difference of the speed in which Mr.

8  Bichsel's vehicle was traveling versus the speed of the
9  vehicle that stuck it from behind -- do you have that in
10  mind?
11            MR. BARRY:  I will object to the form.
12            MR. OLIVER:  Thank you.
13       Q.  Was your answer based upon a differential
14  speed?
15       A.  Meaning both cars were moving?
16            MR. BARRY:  I am going to object to the
17  form to the extent that it assumes facts not in
18  evidence.  But go ahead.
19            MR. OLIVER:  No, I am asking what her
20  opinion was, so I will put it again.
21       Q.  You expressed an opinion a few moments ago.  I
22  just want to make sure --
23       A.  That you understand.
24       Q.  -- that I understand?
25       A.  Okay.
0059
1        Q.  Was that based upon a difference in the speeds
2   of the two vehicles of 75 to 80 miles an hour at the
3   time of impact?
4        A.  That was based on my knowledge of how fast
5   people drive in New York because I used to live there,
6   and somebody receiving a rear-end impact on a restrained
7   person in the car.  That is all that was based on, and
8   they drive fast.  I have no idea how fast either vehicle
9   was moving, but he was hit from behind at a good speed.
10  I mean, it popped out all these disks, and I truly
11  believe that that is what happened.
12            This guy works hard.  He couldn't work with
13  all this pain.  He can't work now with all this pain,
14  and he didn't have any of this pain until after the
15  accident.  That is why, even though there is some
16  question as to what is chronic and what is not -- yes,
17  there is a question.  There is a question, and the only
18  answer for that would have been if we had a whole set of
19  MRI studies before 2001 that demonstrated any of these
20  things, to compare them to post 2001, to really say that
21  is chronic, that is acute, that is a result of, that is
22  not.
23            I mean, there are some things that were in the
24  x-ray reports that I did not include in my list of
25  things directly related that were -- is it truly chronic
0060
1   changes, degenerative changes, that somebody at his age
2   would normally have.
3            Thank you for your time in allowing me to put

4   my own little summary in there.
5              MR. OLIVER:  Thank you very much.
6   CROSS EXAMINATION
7   BY MR. BARRY:
8      Q.  I am going to ask one question, just to
9   clarify.
10     A.  Sure.
11     Q.  Your opinion is not based on the assumption
12  that this vehicle was rear-ended at 70 or 80 miles an
13  hour?
14     A.  At a standstill?
15     Q.  Right.
16     A.  No.  I believe they were both moving.
17     Q.  No, they weren't both moving.  Do you know --
18  let me back up.
19             In your opinion -- has anybody asked you to
20  reconstruct how precisely how this accident occurred and
21  whether --
22     A.  No, no.
23     Q.  Would your opinion change as to the causation
24  of the injuries if I were to have you assume
25  hypothetically that this accident was a simple
0061
1   rear-ender occurring at the speed of, say 30 or 40 miles
2   an hour, as opposed to 70 or 80 miles an hour?
3      A.  If the car that is being hit is moving versus
4   stationary, that would be the only thing that would
5   change, because if it is a stationary vehicle, the
6   impact is more, and the injury would be more.
7      Q.  I will have you assume hypothetically that the
8   vehicle that Mr. Bichsel was riding in was perfectly
9   stationary and was rear-ended, but not at a speed of 75
10  or 80 miles an hour.  I will have you assume
11  hypothetically that that speed might have been 30,
12  something like that, 30 miles an hour.  Would that
13  change your opinion expressed today?
14     A.  That would support it even more because the
15  impact speed would be about 60, and the vehicle that is
16  being impacted on is stationary.  So it is more of a --
17  it is more of a sudden force, so it would even make the
18  injury more likely, which would make my thinking more --
19  would it hurt more to hit a wall that is standing or
20  moving?
21     Q.  Right.
22     A.  That is all I am saying.
23     Q.  Did you ever have the impression from any
24  source that the Bichsel vehicle was at a dead stop and
25  was rear-ended at 70 or 80 miles an hour?  Did anybody

0062
1  ever tell you that?
2      A.  No, no, no.
3              MR. BARRY:  All right.  Thank you.
4  REDIRECT EXAMINATION
5  BY MR. OLIVER:
6      Q.  Have you ever done any professional studies on
7  the effects on the body of forces exerted in motor
8  vehicle accidents?
9      A.  No, sir.
10             MR. OLIVER:  I have nothing further.
11  Thank you.  Shall we call it a day, Mr. Barry?
12             MR. BARRY:  Let's do it.
13             (Deposition concluded:  4:47 p.m.)
14
15
16
17             CARMEN CINTRON
18         SUBSCRIBED AND SWORN TO BEFORE ME, the
19  undersigned authority, on this the      day of
20          , 19   .
21
22
23             NOTARY PUBLIC
24
25