```
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF CONNECTICUT

JOSEPH P. BICHSEL,
          PLAINTIFF              CIVIL ACTION NO.:03-CV-0288(WWE)

VS.

JILLIAN WONG and ALEX WONG,
          DEFENDANTS             OCTOBER 28, 2004
```

**MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE TESTIMONY OF DR. CARMEN CINTRON ON THE ISSUE OF CAUSATION**

The defendants, Jillian and Alex Wong, have moved in limine for an order precluding the expert opinions, testimony, records and reports of one of plaintiff's doctors, Dr. Carmen Cintron, as they are inadmissible under Rule 702 of the Federal Rules of Evidence. Dr. Cintron's opinions, testimony, records and reports on the issue of causation are inadmissible because they are based upon insufficient facts or data, including but not limited to a lack of knowledge relating to plaintiff's subsequent injuries. Moreover, her opinion, testimony, records and reports on the issue of causation are inadmissible because they not based on any methodology, and to the extent that they link the plaintiff's injuries to the motor vehicle accident of June 2001, they are not

grounded on mere presumptions made by Dr. Cintron.

**I.   FACTS**

On June 2, 2004, Dr. Cintron, doctor of osteopathy and one of the plaintiff's treating doctors, prepared a report "to summarize whether or not – based on [her] examination of Mr. Bichsel, . . . [she] thought that the injuries sustained to his musculoskeletal system were related in any way or directly resulted from the car accident in 2001." **(Exhibit A, Deposition of Carmen Cintron, D.O., at 43 [hereinafter "Cintron Dep. Tr."].** In her June 2 report, Dr. Cintron states, in part, as follows:

> Radiographic workup documented the following musculoskeletal injuries which are the direct result of the collision in 2001:
>
> - Erector spinae spasm involving entire spinal column.
> - Central disc herniation C6-C7 with severe bilateral neural foramina narrowing.
> - Left paracentral disc herniation on T10-T11.
> - Right paracentral disc herniation T11-T12 with minimal flattening of the spinal cord.
> - Bulging disc L-2, L-3, L-4.
> - Central disc herniation L-4, L-5
> - Grade I Spondylolisthesis L5-S1 with presence of disc material posteriorly.
> - Likely tear of disc annulus L4-L5, L5-S1

>           which renders the patient highly susceptible
>           to complete disc herniation with minimal
>           future trauma.
> -         Lumbosacral sprain with bilateral
>           sacroiliac/trochanteric/piriformis trigger
>           point tenderness.
> -         Inferior labral tear left shoulder as related
>           to labral periosteal avulsion injury.
> -         Chronic left bicipital tendonitis still
>           present on exam dated March 2, 2004.
> -         Left trapezius/supraspinitus/rhomboidius
>           muscle spasm.

**(Exhibit B, Report of Dr. Cintron, dated June 2, 2004.)**

The defendants now move to preclude the opinions, testimony, records and reports of Dr. Cintron as they relate to the issue of causation because they do not meet the requirements for expert testimony as set out in Rule 702 of the Federal Rules of Evidence.

**II.   STANDARD OF LAW**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert evidence.  That rule provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,

> training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the United States Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." In making such a determination, the court may consider: 1) whether the theory or technique can be tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) whether, with respect to a particular technique, there is a high known or potential rate of error; and 4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* at 592-94. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150 (1999), however, the court recognized that in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience." Thus, the factors identified in

*Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* In such cases, "the trial court must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Nothing, however, in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. *Id. at 157.*

### III. LEGAL ARGUMENT

Dr. Cintron should be precluded from offering opinions, testimony or other evidence in connection with whether plaintiff's injuries are causally related to the accident in this case because they would be based on insufficient facts and an unreliable methodolgy.

By way of background, Dr. Carmen Cintron is a doctor of osteopathic medicine (New York College of Osteopathic Medicine)

and a doctor of internal medicine (Eastern Virginia Medical School).  **(Cintron Dep. Tr. at 7 and 9.)**  She practiced medicine in a variety of locations, including the Virgin Islands, following her graduation.  **(Cintron Dep. Tr. at 9-10.)**  At no time has the plaintiff's practice of osteopathy exceeded 45% of her entire practice.  (**Cintron Dep. Tr., at 9 and 14.)**  Cintron describes her osteopathic practice to encompass the review of x-rays, or x-ray reports, documentation of physical complaints, documentation of symptom complaints, documentation of limitations on range of motion, documentation of duration of illness and documentation of impact on quality of life.  **(Cintron Dep. Tr. at 13.)**

Dr. Cintron is not certified by any board within the osteopathic medicine field.  **(Cintron Dep. Tr. at 14.)**  She has not published any learned articles in the osteopathic field.  **Id.**  Nor is she a member of any professional organizations with respect to osteopathic medicine.  **Id.**

Sometime around 2002, Cintron commenced her Gallows Bay practice, wherein she treated the plaintiff.  **(Cintron Dep. Tr.**

**at 10-11.)** Although the accident in this case occurred on August 26, 2001, the plaintiff did not begin treating with Dr. Cintron until March 2, 2004, more than 2 ½ years after the accident. **(Cintron Dep. Tr. at 14.)** Nor did Dr. Cintron treat the plaintiff after May 7, 2004, when plaintiff relocated to Oregon. **(Cintron Dep. Tr. at 53.)** Thus, Cintron's treatment of the plaintiff consisted solely of 9 visits over 2 ½ months, 5 times in March 2004, 3 times in April 2004, 1 time in May 2004. During the first visit, and thereafter, Dr. Cintron began osteopathic manipulative techniques (hereinafter "OMT")[1] on the plaintiff. **(Cintron Dep. Tr. at 26.)** Cintron's treatment consisted solely of OMT. **(Cintron Dep. Tr. at 32.)** Cintron did not prescribe any medications to the plaintiff. **(Cintron Dep. Tr. at 26, 29-30.)** Nor did she perform any additional radiological diagnostic testing such as x-rays or MRI's or myelograms, but relied solely

---

[1] Cintron describes the OMT for the plaintiff as equivalent to "deep tissue manipulation. We call it myofascial with counterstrain technique, which is sort of an acupuncture-type technique, except my finger is a lot wider than an acupuncturist's needle. But it is basically a pressure, an application of direct pressure, and the goal is to relax any micro-spasms along the area that the patient has trigger point tenderness." **Cintron Depo., p. 27.**

upon the radiologist reports. **(Cintron Dep. Tr. at 22, 44, 47-48.)** The first visit was approximately 60 minutes long and the subsequent eight visits were no more than 30 to 45 minutes in length. **(Cintron Dep. Tr. at 32-33.)**

    **A.**   <u>**Dr. Cintron's Opinions, Testimony, Records and Reports Are Inadmissible on the Issue of Causation Because They Are Based on Insufficient Facts**</u>

The deposition testimony of Dr. Cintron makes plain that her causation testimony is inherently unreliable because it is based upon insufficient facts. For example, the plaintiff resumed work as a construction worker three weeks prior to his commencement of treatment with Dr. Cintron. **(Cintron Dep. Tr. at 37-38.)** Despite this, Cintron admits that she has no idea what kind of work, if any, the plaintiff had engaged in the 2 ½ years between the time of the accident and the date when she first treated him on March 2, 2004. **(Cintron Depo. at 38, 46-47.)** In fact, Dr. Cintron did not attempt to determine whether the plaintiff's pain had been caused by his resumption of work. **Id.** If Dr. Cintron is going to attempt to link the plaintiff's injuries to the accident, it is imperative that she know whether the plaintiff is working and

what type of work he is performing, especially when plaintiff worked in the physically demanding construction field.

Further undermining Dr. Cintron's reliability is the fact that she was unaware that the plaintiff had at least two falls during the 2 ½ year period between the time of the accident and his commencement of treatment with her on March 2, 2004. **(Exhibit C, Deposition of Plaintiff, at 114-116; Cintron Dep. Tr. at 38-39, 46.)** Certainly, Dr. Cintron would need to know events surrounding the falls and the extent of the plaintiff's resulting injuries in order to accurately assess or attribute plaintiff's injuries to the motor vehicle accident. She knows neither. Even where Dr. Cintron was aware of the traumatic event of plaintiff being assaulted in a home invasion, she apparently did not take it into consideration, or at least did not mention it in her report of June 2, 2004.[2] See discussion, *infra*, in Part III, B. Therefore, she should not be allowed to provide any testimony or other evidence linking the plaintiff's injuries to the motor

---

[2] Dr. Cintron explains the omission of this significant event as her "negligence because it should have been in there, because we did talk about it." **Cintron Depo., p. 39**.

vehicle accident.

Finally, Dr. Cintron's opinion is based upon the mistaken belief that both vehicles were moving at the time of impact. **(Cintron Dep. Tr. at 59-60.)** Even if both vehicles had been moving, however, Dr. Cintron makes clear that she does not know how fast the vehicles were moving. **Id.** Moreover, Dr. Cintron admits that her opinion would change depending upon the degree of impact. **(Cintron Dep. Tr. at 60-61.)** Dr. Cintron clearly did not have sufficient facts by which to conclude that the plaintiff's injuries were caused by the motor vehicle accident at issue here.

Thus, Dr. Cintron lacks sufficient information concerning the plaintiff's subsequent accidents and plaintiff should not be permitted to offer her opinion, testimony, records and reports as to causation because such opinion, testimony, records and reports would be inherently unreliable.

    B.    <u>Dr. Cintron's Opinions, Testimony, Records and Reports Are Inadmissible Because They Are Not Based on Any Reliable Principles or Methods</u>

Dr. Cintron's opinion, testimony records and reports as to causation are unreliable because she did not order any further diagnostic testing despite the fact that her treatment began of the plaintiff began 2 ½ years after the accident. The fact that she did not undertake further diagnostic testing is critical because during the 2 ½ years between the accident and his treatment with Dr. Cintron, the plaintiff had suffered two falls, had been brutally beaten during a robbery of his home, and had recommenced his construction business. Dr. Cintron's failure to order further diagnostic testing is all the more critical given the fact that the plaintiff stated that after the attack in his home he felt pain through his entire back. **(Cintron Dep. Tr. at 39.)** Despite her knowledge of the subsequent attack on the plaintiff, Dr. Cintron did not order any additional x-ray's or MRI's. **(Cintron Dep. Tr. at 22, 44, 47-48.)** The lack of additional x-ray's or MRI's for purposes of comparison with prior films, in light of her knowledge of the subsequent assault and battery, undermines her ability to render an opinion or testimony related to causation where these films may have shown additional

injuries or aggravations that may not be attributable to the defendants' accident.  Indeed, Cintron readily admitted that additional studies, specifically a myelogram of the cervical, thoracic and lumbar spines were necessary to assess the degree of the plaintiff's injury.  **(Cintron Dep. Tr. at 47-48.)**  This is particularly true where there is such a significant 2 ½ year gap between plaintiff's treatment with Cintron and the accident.

Furthermore, Dr. Cintron's opinions, testimony, records and reports as to causation are inadmissible because they assume certain facts without any basis for doing so.  For example, because the motor vehicle accident occurred in New York, Dr. Cintron assumed that the relative speed differential between the two vehicles was between 75 and 80 m.p.h.  **(Cintron Dep. Tr. at 57.)**  Her basis for making such an assumption is that she used to live in New York and she knows how New Yorkers drive.  **(Cintron Dep. Tr. at 59.)**  Dr. Cintron's assumptions, presumptions and unsound opinions are made clear by the following excerpt from her deposition:

   Q.    Let me just -- if I can ask you a question.

I just want to be clear.  Do you have an opinion with reasonable osteopathic probability or certainty as to whether or not the Grade 1 spondylolisthesis, which has been diagnosed by several doctors, is or is not related to this motor vehicle accident?

    A.  I just said I think it is a direct result.  I think it is a direct result.  I think if he was born like that, it would have been -- it would have been worse.  It would have progressed to a Grade 2 or Grade |3.  If you are operating under the presumption -- which I am -- that all of his other injuries occurred as a result of that accident, then yes.  And I am operating under that presumption because he didn't have these problems prior to the accident.
    Now, did the assault make them worse?  Possibly, possibly, but it is hard for me to say how much worse that assault was because I have no idea of exactly what happened, how hard he was flung, if at all, if people landed on him.  You know what I mean?  But with the car, I know he is strapped in his seat.
    People in New York drive about 75, 85 miles an hour.  They are going to the airport, and I can only imagine this guy was slammed.  And so his restrained body had to take that blunt force trauma from behind, so it pushed all of those vertebral bodies and knocked things out asunder and herniated this and popped this out.  If he didn't wear his seat belt, he probably could have been dead.  He would have gone right through the windshield.

    Q.  So is your opinion based on an assumption that the relative difference in speed between the two vehicles was 75 to 80 miles an hour?

    A.  That is my assumption.  That is my assumption.  I have no idea how fast the guy behind him was going.

                    *           *           *

        Q.    You expressed an opinion a few moments ago.
    I just want to make sure --

        A.    That you understand.

        Q.    -- that I understand?

        A.    Okay.

        Q.    Was that based upon a difference in the
    speeds of the two vehicles of 75 to 80 miles an hour at
    the time of impact?

        A.    That was based on my knowledge of how fast
    people drive in New York because I used to live there,
    and somebody receiving a rear-end impact on a
    restrained person in the car.  That is all that was
    based on, and they drive fast.  I have no idea how fast
    either vehicle was moving, but he was hit from behind
    at a good speed.  I mean, it popped out all these
    disks, and I truly believe that that is what happened.
        This guy works hard.  He couldn't work with all
    this pain.  He can't work now with all this pain, and
    he didn't have any of this pain until after the
    accident.  That is why, even though there is some
    question as to what is chronic and what is not -- yes,
    there is a question.  There is a question, and the only
    answer for that would have been if we had a whole set
    of MRI studies before 2001 that demonstrated any of
    these things, to compare them to post 2001, to really
    say that is chronic, that is acute, that is a result
    of, that is not. . . .  Thank you for your time in
    allowing me to put my own little summary in there.


**(Cintron Depo. Tr. at 56-60)**

This exchange makes quite clear that Dr. Cintron assumed that the speed differential between the two vehicles was between 75 and 80 m.p.h., and that her assumption was based on the fact that she used to live in New York and was familiar with the speeds at which New Yorkers drive. Moreover, Dr. Cintron thinks certain facts or imagines them or presumes them to be, but she clearly does not know. She does not know the facts of the assault but admits that it could have made the injuries worse. Dr. Cintron freely admits that there is a question as to whether the plaintiff's injuries are chronic.

Such assumptions, presumptions and unsound opinions are clearly not premised on reliable principles or methods and cannot support any opinion that Dr. Cintron may have as to the issue of causation. They would be nothing more than prohibited ipse dixit opinions. Because her opinion is based upon such unsupported and unwarranted assumptions, Dr. Cintron's opinion, testimony, records and reports are unreliable and therefore, inadmissible.

**IV.   CONCLUSION**

Dr. Cintron's opinions, testimony, records and reports are inadmissible under Rule 702 of the Federal Rules of Evidence because they are based on insufficient facts and unreliable principles and methods.  Dr. Cintron did not know that the plaintiff had twice fallen after the accident; she did she know whether the plaintiff had returned to his construction job after the accident; and she did not know the speeds of the respective vehicles at the time of impact.  Nor did Dr. Cintron base her opinion on reliable principles.  She did not order any additional diagnostic testing despite the fact that the accident occurred 2 ½ years prior to her treatment and despite the fact that the plaintiff had twice fallen and been brutally beaten since the accident.  Under Rule 702 of the Federal Rules of Evidence, and the rules set out in *Kumho Tire Co., Ltd v. Carmichael* and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, these opinions cannot assist the trier of fact as they are inherently unreliable.  Accordingly, the court must discharge its "gatekeeping" function by entering an order precluding Dr. Cintron from testifying that the plaintiff's injuries are directly related to the motor vehicle accident in this case.

```
                    DEFENDANTS, JILLIAN WONG AND
                       ALEX WONG

                    BY:_____
                        Francis J. Drumm, III
                        MULVEY, OLIVER, GOULD & CROTTA
                        83 TRUMBULL STREET
                        NEW HAVEN, CT  06511
                        (203) 624-5111
                        (203) 789-8371 FAX
                        Fed Id. No. CT 24352
```

**CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid on October 28, 2004, to:

William J. Kupinse, Jr., Esq.
Goldstein & Peck
P. O. Box 1538
Bridgeport, CT  06601

Warren F. Sasso, Esq.
Goldstein & Peck
P. O. Box 1538
Bridgeport, CT  06601

Edward L. Barry, Esq.
Hamm & Barry
5030 Anchor Way, Gallows Bay
Christiansted, VI  00820

_____
FRANCIS J. DRUMM, III