IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

---------------------------------x

JOSEPH P. BICHSEL,

       Plaintiff,

  -versus-                 : Civil Action No.
                            03-CV-0288 (WWE)

JILLIAN WONG AND ALEX WONG,

       Defendants.

---------------------------------x



       Deposition of DR. CARMEN CINTRON, taken pursuant to The Federal Rules of Civil Procedure, at the law offices of Mulvey, Oliver, Gould & Crotta, 83 Trumbull Street, New Haven, Connecticut, before Patricia Saya, LSR No. 37, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on August 27, 2004, at 3:30 p.m.

A P P E A R A N C E S:

    For the Plaintiff:

    HAMM & BARRY
    5030 Anchor Way, Gallows Bay
    Christiansted, Virgin Islands 00820
    By:  EDWARD L. BARRY, ESQ.

    For the Defendants:

    MULVEY, OLIVER, GOULD & CROTTA
    83 Trumbull Street
    New Haven, Connecticut 06511
    By:  ROBERT G. OLIVER, ESQ.

SEL v. WONG                                                                    August 27, 2004

Page 3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto that all technicalities as to proof of the official character before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that the signing of the deposition by the deponent may be performed before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that all objections, except as to form, are reserved to the time of trial.

\* \* \* \* \* \*

A.  Yes, sure.

MR. OLIVER: I would like to have this marked as -- Exhibit 1 I guess is fine.

(Defendants' Exhibit 1: Marked for Identification - described in Index.)

Q.  And could you tell me -- I know it is summarized briefly, but what is your present professional status?

A.  I am an internal medicine doctor, residency trained. I graduated from an osteopathic medical school, New York, New York College of Osteopathic Medicine, so I practice two things. My specialty is internal medicine, and I also practice osteopathy. The osteopathy I would say comprises about 40 to 45 percent of my practice, with internal medicine in the remainder.

Q.  Where do you practice?

A.  On St. Croix.

Q.  In the Virgin Islands?

A.  Yes, sir.

Q.  Are you licensed to so practice in the Virgin Islands?

A.  Yes, sir.

Q.  Is that a license purely for osteopathic medicine or does that include a license for internal medicine?

tell me.

A. I went on to Eastern Virginia Medical School, UVMS. That was in Norfolk, Virginia, and I did three years of internal medicine.

Q. And thereafter, what, if any, education or training did you have?

A. That was it.

Q. When did you commence -- after you finished in Norfolk, where did you go?

A. Initially I went back to St. Croix for a very short period. Then I returned to the mainland. I think it was about 1993, to Winston-Salem, North Carolina.

Q. What were you engaged in at that place?

A. More internal medicine. I started an urgent care facility, and then I went and worked with Forsythe Medical Hospital. That was pure internal medicine. They sent us out to a country hospital. I guess it was a physician shortage area, and we established a group practice up there. And at that time I was doing 75 percent internal medicine and about 25 percent osteopathy.

Q. What was that time frame that you were in North Carolina?

A. About six years.

Q. And what licenses, if any, did you have in

North Carolina at that time?

A. At that time, I had a St. Croix license that had expired, and I had an active Virginia license as well as an active North Carolina license.

Q. Following that approximately six-year period, how were you professionally engaged, after that six-year period?

A. After, I went back to St. Croix, and I worked as an internal medicine attending, and I started a practice. It was a young practice. I did that for about two years, did some emergency room medicine on the side for moonlighting purposes. And then finally, I came to open this Gallows Bay office about two and a half, almost three years ago.

Q. So approximately what year would that be, 2001, 2002?

A. Yes. 2002, I think.

Q. And is this your practice alone or are you associated with other professions?

A. Solo. When I return home, I am going to be associated with a Dr. Walter Gardner, but I am not associated with him yet. But that is in my immediate plan when I get back home.

Q. What is the nature of his profession?

A. He is an internal medicine doctor,

nephrologist. He does dialysis, mostly.

Q. And is he an M.D.?

A. Yes.

Q. But you have not yet commenced with him?

A. We have signed contracts.

Q. The office hasn't begun yet?

A. No, no. Right, right.

Q. With respect to the current practice that you have had in the year 2004, prior to your engaging with Dr. Gardner, could you tell us what that practice has consisted of?

A. As far as patients' ailments or how big it is or how much equipment I have in there or --

Q. Sure, that is a fair question. Let me rephrase it. Specifically, how have you focused your professional work, on what aspects of medicine?

A. To suit the needs of my patients, whoever -- that office is a very versatile office because I am a very versatile physician, so I go anywhere from somebody who needs a follow-up for a high blood pressure check to somebody who needs to be sutured to somebody who needs to have a pelvic exam to somebody who is coming in with chronic pain to somebody who needs sinus -- it is a very diverse practice. I meet the needs of my patients. If their needs are beyond what I can offer, I refer them.

films. I can do pretty much very broad internal medicine work.

Q. Now, with respect to the aspects of osteopathic medicine, what is the scope of the work that you do in your professional work in the current office at Gallows Bay?

A. I review x-rays that the patients may have, the actual x-ray, or an x-ray report. If they don't, I get my hands on it. I document physical complaints, symptomatic complaints, duration of illness, limitation of range of motion, impact on quality of life, and then I do manipulation therapy.

Q. I'm sorry, you do what?

A. Manipulation therapy. That is OMT, abbreviated osteopathic manipulation therapy, where I treat chronic musculoskeletal pain. I cannot fix a scoliosis with my hands. A lot of the chronic cervical and lumbar pain, I can offer some sort of temporary relief of pain, but I cannot fix a herniated disk. I cannot make a weak leg stronger: I am limited to my hands. I can't go deeper than my hands can feel.

Q. Can you give me a percentage breakdown, as you did in Virginia -- I'm sorry, as you did in North Carolina, with respect to the practice you have had at Gallows Bay from 2002 to the present time as between

internal medicine and osteopathic medicine?

A. Osteopathy -- as I said earlier, I believe I said about 45 percent, between 40 and 45 percent of my patients -- and that is a growing number -- become osteopathic-type patients because a lot of my chronic patients, like my diabetics and my hypertensives and my older people with arthritis and tendonitis and all this, have now recognized that I can help them too. So that number is actually growing.

Q. Have you been certified by any board --

A. No, sir.

Q. You have to let me finish the question.

A. Okay.

Q. -- within the osteopathic medicine field?

A. No.

Q. Have you published any learned articles in the osteopathic medicine field?

A. No. I'm sorry. No, sir. I'm sorry.

Q. It has to be verbal.

A. Yes, yes, yes. Okay.

Q. Are you active in any professional organizations with respect to the osteopathic medicine field?

A. No, sir.

Q. Now, when did you first see Joseph Bichsel as

1   A.  Yes, he has seen him.

2   Q.  You don't know the results of what occurred?

3   A.  Exactly, exactly.

4   Q.  And that doctor has not, if I am correct,
5   transmitted any information to you?

6   A.  He probably did because his secretary wanted
7   my mailing address for just that purpose. But then I
8   left St. Croix, and so it is probably in my mail.

9   Q.  As of today, as you sit here today, you don't
10  know what, if anything, he has done; is that correct?

11  A.  Correct.

12  Q.  All right. Would you be kind enough then to
13  tell me what -- let me ask you this. Either here or in
14  St. Croix, did you ever receive any films, x-rays, or
15  MRIs to actually review or have you only seen the
16  reports, the written reports?

17  A.  Only the reports.

18  Q.  Would you tell us what the history was that
19  Mr. Bichsel gave you, if you took one, when you first
20  saw him?

21  A.  Would you mind if I just sort of read it off
22  of the summary?

23  Q.  Whatever, however you feel it appropriate to
24  refresh your recollection.

25  A.  52-year-old male, right-handed, was very

```
 1   spasm, OMT, and it says "left bicipital tendonitis. Oh,
 2   yes, I did write "bilateral lumbar spasm."
 3       Q.   But before that, it says, "May need" --
 4   something or other?
 5       A.   "Kenolog." Kenolog is an injectable steroid.
 6       Q.   Did you give him or administer that?
 7       A.   That office visit, no, and I don't believe we
 8   ever decided to do that. He wasn't too keen on the idea
 9   of being injected with steroids.
10       Q.   What, if any, treatment program, if any, did
11   you prescribe?
12       A.   I began OMT, osteopathic manipulative
13   techniques.
14       Q.   In the case of Mr. Bichsel, could you tell us
15   what those were?
16       A.   If you look in the physical exam, it shows --
17       Q.   Go ahead, ma'am. You were about to answer
18   that question.
19       A.   In the physical exam, if you see under C4-C6,
20   rotator, left side, bent left with trigger points along
21   there.
22       Q.   Just tell me what page you are on, ma'am.
23       A.   I am on the second page.
24            MR. BARRY:  I am confused too.
25       A.   Second page, 3, 2.
```

     MR. BARRY: Second page in reverse order.

1    Q.   In any event --

2    A.   I worked on his cervical spine.

3    Q.   Just tell us where on the page or hold it up
to us so we can figure it out. I have got that page
now. Where are you referring to?

4    A.   Right where it starts to say "C4-C6."

5    Q.   Thank you very much. Now proceed.

6    A.   That is like a physical exam. That is like an
osteopathic physical exam. So when you asked the
question, how did I direct treatment, it was towards
that area.

7    Q.   And what is the treatment? Is that some sort
of massage or what?

8    A.   It is a deep tissue manipulation. We call it
myofascial with counterstrain technique, which is sort
of an acupuncture-type technique, except my finger is a
lot wider than an acupuncturist's needle. But it is
basically a pressure, an application of direct pressure,
and the goal is to relax any micro-spasms along the area
that the patient has trigger point tenderness.

9    Q.   So is this therapy that is applied by you, by
your hands?

10   A.   Yes, sir.

11   Q.   And with respect to this OMT, osteopathic