accident?

A. No, sir, I don't.

Q. Where it starts off again, "After 3 weeks left shoulder pain, weakness reoccurred," and so forth, it talks about pains and walking and starting and so forth, going to the sentence ending, "at times forcing bed rest" -- do you see where I have referred to?

MR. BARRY: Well --

Q. Never mind. I will withdraw that. There is a sentence that says, "After 3 weeks" -- do you see that, ma'am?

A. "After 3 weeks left shoulder pain and weakness."

Q. Yes, ma'am.

A. Yes.

Q. Then the next sentence, "He is unable to comfortably lift," and so forth?

A. Yes.

Q. The next sentence, "Prolonged walking and standing," and so forth?

A. Yes.

Q. Is that based upon what he told you?

A. That is based upon what he told me, yes.

Q. At the last sentence you said, "To more accurately assess the degree of injury I have

recommended myelogram studies of cervical spine, thoracic spine, and lumbar spine with neurosurgical evaluation"?

    A.    Yes, sir.

    Q.    And do you know whether those have ever been performed?

    A.    That is what I was saying. That piece of my note is missing because it is probably in the mail.

    Q.    And the doctor you spoke with in Oregon, did you tell him you were recommending those three types of myelographic studies?

    A.    Yes, sir.

    Q.    Did the doctor indicate to you, to the best of your recollection, that he agreed and would perform those, or did he not?

    A.    Well, he just said, "Let's go on ahead and schedule the appointment, and I will let you know my findings and recommendations."

    Q.    You said in your last paragraph, in your clinical judgment, he will likely require surgical intervention in the future. What is that opinion based on?

    A.    That opinion is based on the two lesions in his lumbar spine, L4-L5 and L5-S1. Apparently, the stress of the trauma tore the disk annulus. That is

A.    My first visit, $90 with everything; history, physical, and the beginning of treatment.

Q.    What about subsequent visits, ma'am?

A.    That is $60 a visit.

Q.    And would that have been true of each of the subsequent visits?

A.    Yes, sir.

Q.    So as a matter of mathematics, we can simply multiply by the number of visits?

A.    Exactly.

Q.    Has any portion of that been paid?

A.    He paid cash or check. Sometimes he wrote a personal check.

Q.    So am I correct then that the entire amount of these bills has been paid?

A.    Yes, sir.

Q.    Since May the 7th, 2004, the last visit for which you have office notes, have you had any personal contact with him?

A.    No, sir.

    MR. OLIVER: That is all I have. Thank you very much, ma'am.

    MR. BARRY: I have nothing.

    (Off the record discussion.)

BY MR. OLIVER:

1  so the initial question that you asked me about spasm,
2  and that is it.
3       Q.  Let me just -- if I can ask you a question.  I
4  just want to be clear.  Do you have an opinion with
5  reasonable osteopathic probability or certainty as to
6  whether or not the Grade 1 spondylolisthesis, which has
7  been diagnosed by several doctors, is or is not related
8  to this motor vehicle accident?
9       A.  I just said I think it is a direct result.  I
10 think it is a direct result.  I think if he was born
11 like that, it would have been -- it would have been
12 worse.  It would have progressed to a Grade 2 or Grade
13 3.  If you are operating under the presumption -- which
14 I am -- that all of his other injuries occurred as a
15 result of that accident, then yes.  And I am operating
16 under that presumption because he didn't have these
17 problems prior to the accident.
18          Now, did the assault make them worse?
19 Possibly, possibly, but it is hard for me to say how
20 much worse that assault was because I have no idea of
21 exactly what happened, how hard he was flung, if at all,
22 if people landed on him.  You know what I mean?  But
23 with the car, I know he is strapped in his seat.
24          People in New York drive about 75, 85 miles an
25 hour.  They are going to the airport, and I can only

1   imagine this guy was slammed. And so his restrained
2   body had to take that blunt force trauma from behind, so
3   it pushed all of those vertebral bodies and knocked
4   things out asunder and herniated this and popped this
5   out. If he didn't wear his seat belt, he probably could
6   have been dead. He would have gone right through the
7   windshield.
8       Q.   So is your opinion based on an assumption that
9   the relative difference in speed between the two
10  vehicles was 75 to 80 miles an hour?
11      A.   That is my assumption. That is my assumption.
12  I have no idea how fast the guy behind him was going.
13      Q.   And if the relative differential speed of
14  impact was less than 75 to 80 miles per hour, would that
15  affect your opinion?
16      A.   No, because it is going to be twice that
17  whatever impact hits.
18      Q.   I'm sorry, I misunderstood.
19      A.   Unless it was a tap at a stoplight -- say, for
20  instance, you tap somebody. I would say yes, these
21  injuries were not caused by -- that is a tap.
22      Q.   Let me just ask the question so it is clear.
23  What I was referring to was a differential speed; that
24  is, the difference between the speed of the vehicle in
25  which Mr. --

BICHSEL v. WONG                                                August 27, 2004

Page 58

```
 1            MR. BARRY:  I think she answered your
 2   question.
 3            MR. OLIVER:  We will correct it and make
 4   sure it is correct.  I don't want there to be any
 5   misunderstanding, Mr. Barry.
 6       Q.   My question was, the differential speed; that
 7   is to say, the difference of the speed in which Mr.
 8   Bichsel's vehicle was traveling versus the speed of the
 9   vehicle that stuck it from behind -- do you have that in
10   mind?
11            MR. BARRY:  I will object to the form.
12            MR. OLIVER:  Thank you.
13       Q.   Was your answer based upon a differential
14   speed?
15       A.   Meaning both cars were moving?
16            MR. BARRY:  I am going to object to the
17   form to the extent that it assumes facts not in
18   evidence.  But go ahead.
19            MR. OLIVER:  No, I am asking what her
20   opinion was, so I will put it again.
21       Q.   You expressed an opinion a few moments ago.  I
22   just want to make sure --
23       A.   That you understand.
24       Q.   -- that I understand?
25       A.   Okay.
```

Q. Was that based upon a difference in the speeds of the two vehicles of 75 to 80 miles an hour at the time of impact?

A. That was based on my knowledge of how fast people drive in New York because I used to live there, and somebody receiving a rear-end impact on a restrained person in the car. That is all that was based on, and they drive fast. I have no idea how fast either vehicle was moving, but he was hit from behind at a good speed. I mean, it popped out all these disks, and I truly believe that that is what happened.

This guy works hard. He couldn't work with all this pain. He can't work now with all this pain, and he didn't have any of this pain until after the accident. That is why, even though there is some question as to what is chronic and what is not -- yes, there is a question. There is a question, and the only answer for that would have been if we had a whole set of MRI studies before 2001 that demonstrated any of these things, to compare them to post 2001, to really say that is chronic, that is acute, that is a result of, that is not.

I mean, there are some things that were in the x-ray reports that I did not include in my list of things directly related that were -- is it truly chronic

changes, degenerative changes, that somebody at his age would normally have.

Thank you for your time in allowing me to put my own little summary in there.

MR. OLIVER: Thank you very much.

CROSS EXAMINATION

BY MR. BARRY:

Q. I am going to ask one question, just to clarify.

A. Sure.

Q. Your opinion is not based on the assumption that this vehicle was rear-ended at 70 or 80 miles an hour?

A. At a standstill?

Q. Right.

A. No. I believe they were both moving.

Q. No, they weren't both moving. Do you know -- let me back up.

In your opinion -- has anybody asked you to reconstruct how precisely how this accident occurred and whether --

A. No, no.

Q. Would your opinion change as to the causation of the injuries if I were to have you assume hypothetically that this accident was a simple

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___15___ day of ___September___, 2004.

_____
NOTARY PUBLIC

My Commission Expires:
6/2005

# ERRATA SHEET

CAPTION: JOSEPH BICHSEL VS. JILLIAN WONG
DEPOSITION OF: DR. CARMEN CINTRON
DATE OF DEPOSITION: AUGUST 27, 2004

In order to make this deposition more nearly conform to the testimony, the deponent wishes to make the following changes:

| PAGE# | LINE# | NOW READS | SHOULD READ |
|---|---|---|---|
| 8 | 11 | DA certificate | DEA certificate |
| 8 | 11 | DA number | DEA number |
| 8 | 24 | I went - -in osteopathy? | osteopathy? |
| 9 | 3 | UVMS | EVMS |
| 9 | 14 | started an | started at an |
| 11 | 17 | whoever - - | what ever they may be |
| 12 | 24 | do -- | do and |
| 12 | 25 | scalp | scout |
| 16 | 1 | accident, and | accident; |
| 21 | 11 | have | made |
| 23 | 9 | - - | painful |
| 23 | 10 | through | throughout |
| 25 | 15 | AMP | A&P |
| 29 | 4 | - - | the same trigger points |

1  ever tell you that?
2       A.   No, no, no.
3            MR. BARRY:  All right.  Thank you.
4  REDIRECT EXAMINATION
5  BY MR. OLIVER:
6       Q.   Have you ever done any professional studies on
7  the effects on the body of forces exerted in motor
8  vehicle accidents?
9       A.   No, sir.
10           MR. OLIVER:  I have nothing further.
11 Thank you.  Shall we call it a day, Mr. Barry?
12           MR. BARRY:  Let's do it.
13           (Deposition concluded:  4:47 p.m.)
14
15
16           *signature*
17           CARMEN CINTRON
18      SUBSCRIBED AND SWORN TO BEFORE ME, the
19 undersigned authority, on this the 4th day of
20 October, 2004
21           *signature*
22           CATHERINE McWAYNE
              NOTARY PUBLIC
23           My Commission Expires 12/15/06
              NOTARY NP-029-49C
24
25